
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2017

## STATE OF TENNESSEE v. JUSTIN DANIEL ADAMS

**Appeal from the Circuit Court for Lawrence County**
**No. 33063      J. Russell Parkes, Judge**

_____

### No. M2016-00835-CCA-R3-CD

_____

The Defendant, Justin Daniel Adams, pleaded guilty to aggravated assault, agreeing to an out-of-range sentence of eight years. The parties agreed to allow the trial court to determine the manner of service of his sentence. After a hearing, the trial court ordered that the Defendant serve his sentence in confinement. On appeal, the Defendant contends that the trial court erred when it denied him an alternative sentence and that his judgment form should be amended to reflect applicable pretrial jail credit.[1] We affirm the trial court's judgment. We remand the case to the trial court for the entry of an amended judgment that reflects the Defendant's applicable pretrial jail credit.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Claudia S. Jack, District Public Defender; Brandon E. White, Columbia, Tennessee (on appeal); and Robert H. Stovall, Jr., Assistant District Public Defender, Lawrenceburg, Tennessee, for the appellant, Justin Daniel Adams.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Cooper, District Attorney General; and Gary M. Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

---

[1] The Defendant presented a third issue regarding judicial diversion, but he filed a motion with this Court, which we granted, to withdraw that issue.

This case arises from the Defendant's placing two guns to the rib and temple of the victim on January 6, 2015. For his actions, a Lawrence County grand jury indicted the Defendant for aggravated kidnapping and unlawful possession of a firearm during the commission of a dangerous felony. On January 4, 2016, the Defendant pleaded guilty to aggravated kidnapping, a Class B felony, in exchange for an eight-year, Range I, sentence, agreeing to allow the trial court to determine the manner in which he would serve that sentence. The State agreed to dismiss the firearm charge. On February 22, 2016, the Defendant filed a motion to withdraw his guilty plea, averring that his guilty plea was unknowingly and involuntarily entered because he was not aware that the crime to which he pleaded guilty required the service of his sentence at 100%. The trial court granted the Defendant's motion to withdraw his guilty plea.

On March 14, 2016, the Defendant pleaded guilty to aggravated assault, a Class C felony, agreeing to an out-of-range sentence of eight years. At the guilty plea hearing, the trial court ensured that the Defendant understood that, in exchange for his guilty plea to a lesser charge, he was agreeing to a Range II sentence of eight-years, even though he was considered a Range I offender, which carried an applicable sentencing range of three to six years. The trial court explained that the Defendant was so doing to avoid the possibility of having to serve his sentence at 100%. The trial court then ensured that the Defendant understood that the plea agreement contemplated that the trial court would determine the manner of service of the Defendant's sentence. The Defendant acknowledged that he understood the plea agreement and the out-of-range sentence. He then offered that he was pleading guilty because he had, in fact, committed the offense.

The trial court held a sentencing hearing during which the parties presented the following evidence: The victim testified that he worked as a self-employed hairdresser in Loretto, Tennessee. The victim recalled that, on January 6, 2015, at around 2:00 or 3:00 p.m., he had finished with work and was cleaning out his car at a gas station located next door to the salon. An employee from the hair salon came toward him and said that there was a man who needed a haircut, and the victim saw the man to whom she was referring, the Defendant. The victim told the woman and the Defendant that he would be happy to do it. The Defendant asked the cost, and the victim told him $5.00. The Defendant said he had to call his mother and then proceeded to appear to text someone on the cellular phone in his possession. The Defendant then told him that he could not get a haircut at that time. The victim said that he did not detect any anger in the Defendant's demeanor at that point.

The victim said that he returned to vacuuming his car and that the Defendant remained and struck up a conversation with him about a Loretto High School bumper sticker on the victim's car. He described this as casual conversation and said the two talked for between twenty and forty minutes. The Defendant then said to the victim that

2

his mother had asked if the victim could give the Defendant a ride home so that the Defendant did not have to walk. The victim told the Defendant that he could give him a ride after he finished cleaning his car.

The victim testified that, when he began driving the Defendant home, they headed north. The victim noticed the hilt of a "particular knife" that the Defendant had that looked like a knife that was similar to one the victim owned. The victim said he told the Defendant, "Hey, man, if I would have known you were armed like that, I don't know if I would have given you a ride." The victim said that he was not afraid at that point and was joking. The Defendant then pulled a gun and placed it to the right-side of the victim, near his ribs, and said, "[A]rmed like what? . . . [D]o you mean armed like this, mother f***er?" The victim said he was completely caught off guard by the change in the Defendant's demeanor. The Defendant then took a second gun out and placed it to the victim's temple and said, "[M]aybe like this, b**ch?" The victim said that he was afraid for his life.

The victim testified that he began begging and pleading with the Defendant, asking him why he was doing this when the victim was giving him a ride home. The victim said he slowed the car, and the Defendant said, "[D]on't f***ing do it." The victim pulled over, stopped the car, pushed the gun away from his head, and jumped out of the car. He ran across the street to a Mapco gas station and asked the attendant to call 911. The victim said he remained at the gas station until law enforcement arrived.

During cross-examination, the victim testified that, before he agreed to give the Defendant a ride, the Defendant told him that he lived on Commerce Street, which was "[n]ot very far" from the car wash. He said that the Defendant pulled out the weapons after the two had been in the car together for three or four minutes. The victim estimated that the weapons were pointed at him for approximately one to one-and-a-half minutes before he successfully stopped and exited his car. He agreed that the Defendant never fired a weapon at him.

Okie Littrell, Jr., testified for the Defendant, saying that he lived close to the Mapco gas station located near these events. Mr. Littrell said that he had known the Defendant for five years and that, shortly before these events, the Defendant moved into an apartment near him. Mr. Littrell said that the Defendant was a "pretty timid boy," whom had never given Mr. Littrell any problem. He found it hard to believe the events about which the victim testified. He found it unlikely that the Defendant would brandish a weapon and implausible that the Defendant could hold two weapons in the manner described by the victim.

Mr. Littrell opined that the Defendant would not survive in jail. He said that the

3

Defendant would not hurt anybody. He expressed no concern if the Defendant came back to live next to him, saying that he was happy to offer the Defendant a room in his home if necessary.

During cross-examination, Mr. Littrell testified that he was unaware that the Defendant had said that he sometimes thought about killing people but that this information did not change his opinion. During redirect examination, Mr. Littrell said that, in the five years that he had known the Defendant, the Defendant had never been homicidal and never threatened him or anyone else. Mr. Littrell said he had seen the Defendant upset and crying on occasion but that he did not believe that the Defendant would ever hurt anyone intentionally.

Teresa Anne Ray, the Defendant's mother, testified that the Defendant was twenty-five years old at the time of the sentencing hearing. She said that the Defendant had never expressed any desire to kill anyone to her. Ms. Ray testified that the Defendant lived with her and that if he received probation she would get a two bedroom so that he could again live with her.

During cross-examination, Ms. Ray testified that, after these events, the Defendant called her and asked her to pick him up at a Sonic near where the crime occurred. She said that, after she picked him up, rather than go back out onto the highway, she went through a man's yard to leave the area. She agreed that she saw a police cruiser with its blue lights activated before she left through the man's yard. She further agreed that, after she got back onto the highway, another law enforcement officer began following her and activated his blue lights. She did not stop immediately. She said that she intended to stop, but another officer pulled in front of her vehicle forcing her to stop. Ms. Ray agreed that, after officers got her out of her vehicle, they found two guns underneath her front seat. Ms. Ray said she was unaware the guns were in her vehicle.

Ms. Ray testified that the Defendant had "mental problems" since he was seven years old. She had taken him to multiple doctors over the years to address his issues.

During redirect examination, Ms. Ray testified that the doctors had told her that, in terms of mental development, the Defendant was three or four years behind his actual age. She said the doctors he had seen did not indicate that the Defendant was a threat to himself or anyone else. She said that they informed her that the Defendant had learning disabilities and a type of autism. She said that, a few years before, the Defendant had been admitted to a mental hospital for six days.

Glenda Gail Buie testified that she had known the Defendant for his entire life, and she expressed surprise by the victim's testimony. She said that Ms. Ray never

allowed the Defendant to play with guns and that she was not scared of the Defendant coming home to live near her. Ms. Buie said that the Defendant never told her that he wanted to kill anyone, and in the more than twenty years she had known him, he had never hurt anyone.

Willie Flippo testified that he was the Defendant's uncle by marriage and had known him since he was an infant. He said that the events described by the victim did not comport with his experience with the Defendant. The Defendant, he said, had never hurt anyone, followed rules well, and accepted supervision. Mr. Flippo opined that the Defendant would be successful on probation and that he did not pose a danger to anyone. During cross-examination, Mr. Flippo testified that he was unaware whether the Defendant had previously attempted suicide. He said that their interactions were limited to family events, but he felt he knew the Defendant "well."

Edith Flippo, the Defendant's aunt, testified that she had known the Defendant since his birth and that the Defendant's mother had not had "any trouble" with him. Mrs. Flippo said that the Defendant had "always been slow," sometimes behind his peers but that he had never attacked anyone or broken anything. Mrs. Flippo said that the Defendant had never fought with other kids or any authority figures. She opined that the Defendant, who had no history of drug use, would be successful on probation. During cross-examination, Mrs. Flippo said that she was unaware whether the Defendant had attempted suicide.

Donald Gene Ray, the Defendant's uncle, said that he had known him since he was a baby. He said that the Defendant had never hurt, or expressed a desire to hurt, anyone. Mr. Ray testified that, while he was unaware whether the Defendant had attempted suicide, he knew that the Defendant was not "normal," in that he was a "little slow."

The Defendant testified that he had pleaded guilty to aggravated assault in exchange for an eight-year sentence. He said that he was a "little slow" and at the age of twenty-five had only completed the eighth grade in school. The Defendant said that, daily, he took Adderall, Xanax, a "pain pill," a "breathing pill, two different blood pressure pills, a stomach pill, [and] a sugar pill." His medication precluded him from driving, and he had never had a driver's license. The Defendant walked most places, which is why he sought a ride from the victim on the day of this offense.

The Defendant recalled that, in 2009, he was hospitalized in a mental facility following the death of his father. He said that he attempted to commit suicide by cutting his throat because he was depressed. The Defendant said he was unable to work, so he drew a disability check, which was managed by his mother.

5

The Defendant said that he had no criminal record, had never been in jail or in trouble, and asked for probation so he could help take care of his mother. He said that she did not have any weapons in her home. The Defendant said that he would have no contact with the victim if he were released.

During cross-examination, the Defendant testified that he and his mother both owned a gun. The Defendant said he purchased the gun that belonged to him from a pawn shop. The Defendant testified that he did not have either gun with him on the day of the offense and that he only had his knife on his belt. He denied ever pointing a gun at the victim. He said that his mother must have been driving around with the two guns underneath her seat. The Defendant said he never threatened the victim and that the victim pulled over and jumped out of his car for no reason. The Defendant denied telling the officer that he may have pointed a gun at the victim, saying that he did not understand the officer.

The Defendant said he was unsure why he was allowed to quit school at fifteen years old. He was unsure whether his mother had promised to homeschool him, making it legal for him to leave school.

The Defendant said he told the presentence investigator that he had "ADHD" and "suicidal tendencies" but that he never acted upon those tendencies. The Defendant agreed that he tried to cut his throat in 2009 and that he had also tried to shoot himself "a couple of years ago."

During redirect examination, the Defendant said that, if given probation, he would seek mental health treatment. He said that he did not point a gun at the victim but that he pleaded guilty because he was "tired of dealing with it" and wanted to "go home to [his] mama." The Defendant said that, if released, he would stay out of trouble.

During recross-examination the Defendant admitted hearing his mother say that she was unaware that the guns were in her truck on the day of the Defendant's arrest. The Defendant maintained that he also did not know that the guns were in her truck. The State reminded the Defendant that perjury was a felony offense and asked the Defendant again if he had threatened the victim with a gun. The Defendant invoked his Fifth Amendment right not to incriminate himself.

During the Defendant's allocution, he said:

[The victim] offered me a ride. He s[aw] the knife on my belt. He made a comment about me lying about it. He threatened to hit me. And after we

6

got up to the red light, he jumped out and he said, don't hurt me, take the car. And that's when I ended up in handcuffs. I started having an asthma attack.

Based upon this evidence, the trial court found:

I've considered the nature and circumstances of the offense. As it relates to the nature and the circumstances of this offense, the Court is particularly troubled with and specifically finds now that [the victim] is a credible individual. I find contrary to what [the Defendant] has testified to, that [the Defendant] did possess the two guns that were used that day. It simply makes no sense to this Court that the immediate report to the authorities by [the victim] would indicate that there were two handguns used, and lo and behold, what is found in [the Defendant's] mother's vehicle but two handguns. I find that this is particularly egregious and heinous, and not your quote, run-of-the-mill, assault case. Not just one weapon was used, but two. It was not in the heat of the moment, so to speak in the sense that it was not family members arguing or friends arguing or even bitter enemies for years arguing.

The Court is also particularly troubled with the fact that the family members who have testified for [the Defendant] said that they have no knowledge of prior suicidal ideations. And, in fact, [the Defendant] says that not only has he attempted suicide once, but at least twice. Once resulting in . . . him slitting his own throat or attempting to cut his own throat for which he received hospitalization for one week. The second time when he attempted to use a firearm and commit . . . suicide the gun did not fire.

I also find after having reviewed the presentence report, that the Court can consider the physical and mental condition and societal history of the [D]efendant, and the Court has done so. While the Court is not denying probation based on his mental ability, mental capacity or lack thereof or any form of impairment, the Court has considered that in denying probation.

I also find and have considered the facts and circumstances surrounding the offense and the nature of the circumstances of the criminal conduct involved. Specifically, I find that this . . . particular individual had used weapons in the past. Those weapons had been used prior to the day of this particular offense to inflict or attempt to inflict bodily injury to himself.

7

However, there was a change on this particular date when bodily injury was threatened to another individual with deadly weapons, to wit, two different firearms.

The [D]efendant has no prior criminal record and the Court has considered that. The Court has also considered the previous actions and/or character of the [D]efendant. I've also considered whether or not the [D]efendant might reasonably be expected to be rehabilitated and the [D]efendant's potential or lack of potential for rehabilitation, including the risk that during the period of probation the [D]efendant will commit another crime. He's never been on probation. He's never been on any type of supervision that is before this particular Court. But I have considered whether or not measures least restrictive and confinement have frequently or recently been applied . . . and I find that this is not applicable in this particular case.

The question of whether or not the confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses has been considered by the Court. I've considered not only specific deterrence, but general deterrence in this particular case and I find that that would be an applicable factor.

I now find that this offense was particular egregious, heinous. And I now find that the [D]efendant has failed to accept responsibility for this particular offense although he has now pled guilty to the amended charge of aggravated assault outside the range. I also find that the [D]efendant has not been truthful today in offering his testimony before the Court.

For the foregoing reasons and all of the findings of fact which I have now made, I deny . . . the [D]efendant probation and I find that it would be . . . remiss in my duties and not abiding by my oath if I did not impose [a] sentence of eight years to be served in the Tennessee Department of Corrections [sic].

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it sentenced him. He asserts that the trial court improperly denied his request for an alternative sentence. He further asserts that the judgment form also improperly omits the jail credit to which he

is entitled for January 6, 2015 to March 31, 2016.  The State counters that the Defendant has not met his burden of showing that the trial court erred by ordering him to a sentence of confinement.  The State agrees that the judgment of conviction should be amended to show the Defendant's applicable pretrial jail credit.  We agree with the State.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise,* 380 S.W.3d 682, 708 (Tenn. 2012); *see State v. Caudle,* 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing).  In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  *See* T.C.A. §§ 40-35-102, -103, -210 (2014); *see also State v. Ashby,* 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is on the appellant to demonstrate the impropriety of his sentence.  *See* T.C.A. § 40-35-401 (2014), Sentencing Comm'n Cmts.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less.  *See* T.C.A. § 40-35-303(a) (2014).  The Defendant's sentence meets this requirement, as he was sentenced to eight years.  Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary.  *See* T.C.A. § 40-35-102(6).  The Defendant, convicted of a Class C felony, is considered a favorable candidate for alternative sentencing.  The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

9

*See also State v. Zeolia,* 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Candor is a relevant factor in assessing a defendant's potential for rehabilitation, *see State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994), and the lack of candor militates against the grant of probation. *See, e.g., State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 2001). The burden of proving suitability for probation rests with the defendant. *See* T.C.A. § 40-35-303(b).

In the case under submission, we conclude that the trial court did not abuse its discretion when it denied the Defendant an alternative sentence. The trial court considered the nature and circumstances of the offense, noting that this offense was committed with two weapons, that the victim and the Defendant did not know each other, that they were not arguing, and that the victim was assisting the Defendant at the time of the offense. The trial court further noted that the Defendant had used a handgun in an attempt to kill himself previously and that this offense was particularly egregious and heinous. The trial court also found that the Defendant's testimony was not credible. It noted that the Defendant, while entering a plea of guilty, denied ever pointing a weapon at the victim. Instead, the Defendant said that the victim jumped out of the car for no reason. The Defendant also said that he did not know why his mother had two guns underneath her seat when she was stopped while driving him shortly after this offense. He similarly said that, contrary to their testimony, he did not tell police officers that he may have pointed a gun at the victim. The trial court found that the Defendant's lack of candor weighed against his grant of an alternative sentence because the Defendant failed to accept responsibility for his offense. Under these circumstances, we conclude that the trial court did not err when it denied the Defendant an alternative sentence.

After a review of the record, we agree with the parties that the Defendant's judgment of conviction should reflect his pretrial jail credit from January 6, 2015, to March 31, 2016. We remand this case for the entry of an amended judgment to so reflect.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment. We remand the case for the entry of a judgment of conviction reflecting the Defendant's applicable pretrial jail credit.

_____
ROBERT W. WEDEMEYER, JUDGE

10